## CONSOLIDATED WAGON & MACHINE CO.
### v. KAY et al.

No. 5250.   Decided May 4, 1933.   (21 P. [2d] 836.)

596

*Thatcher & Young,* of Ogden, for appellants.

*H. D. Moyle* and *R. C. Wilson,* both of Salt Lake City, for respondent.

STRAUP, Chief Justice.

This action was brought to foreclose a chattel mortgage. Judgment went in favor of the plaintiff. The defendants appeal. By the complaint it in substance is alleged that on June 8, 1928, the plaintiff by a written contract, for the sum of $1,625, sold and delivered to the defendants Loren Kay and George S. Cooke what modestly was called "goods, wares, and merchandise," but as shown by a copy of the

contract attached to the complaint, consisted of a second-hand gleaner-thresher for the sum of $1,000, and a Fordson tractor for $625, a total of $1,625, payable $100 in cash, $300 on delivery, $425 December 1, 1928, and $700 December 1, 1929, with interest at 8 per cent per annum on the deferred payments. The contract provided that the title to and the right to repossess the property remained in the plaintiff until the purchase price and interest were fully paid; that, on default of any of such payments, the plaintiff was given the right to repossess the property and sell it at public or private sale either with or without notice, and apply the proceeds of sale on the deferred payments, the purchasers to pay any balance remaining. By the contract it was further stipulated that no warranties either express or implied were given on secondhand machinery, and that such machinery was sold at greatly reduced prices without warranty or conditions; that no verbal or any agreement, warranty, guaranty, or representation whatever was binding on either party, except as contained in the written contract itself, and that the plaintiff was not to be held liable for any damage suffered or sustained in the use, operation, or handling of the machinery, nor for any implied warranty, nor for any loss of crops, profits, expenses, or damages resulting by reason of any delay or nonperformance of the machinery from any cause whatsoever.

It was further alleged that on July 1, 1929, in order to secure the payment of the indebtedness as evidenced by the contract, the defendants Loren Kay and Zina Kay, his wife, in the sum of $1,183.48 (that being the amount then due and unpaid on the contract), executed and delivered to the plaintiff a chattel mortgage, by the terms of which they mortgaged to the plaintiff two cows, the gleaner-thresher combine, the Fordson tractor, and crops of wheat on 25 acres, all fully described in the mortgage.

It is further alleged that, notwithstanding frequent demands made on the defendants for payment of the indebtedness, no part thereof was paid, except $100 July 8, 1928,

when the contract was entered into, $300 August 15, 1928, $64 October 7, 1928, $50 March 5, 1929, and $243.85 September 25, 1929 (after the mortgage was given), and that there remained due and owing on the indebtedness as evidenced by the contract and the mortgage the sum of $963.93, principal and interest.

The defendants Loren Kay, Zina Kay, and George S. Cooke filed a joint answer, wherein they admitted the purchase and delivery of the machinery, the execution of the contract and of the mortgage and the payments made as alleged in the complaint; but denied that there was due and owing the plaintiff the sum of $963.93 as alleged in the complaint or that any sum was due the plaintiff. It then is alleged that the mortgage was given without consideration; that false and fraudulent representations were made with respect to the gleaner-thresher when purchased in the particulars that it was represented that the thresher would cut heavy irrigated grain; that it would handle grain in which weeds, sweet clover, cokleburrs, and sunflowers were growing; that the gleaner was suitable for threshing alfalfa and clover seed; that it would cut all kinds of grain growing in the vicinity in which the gleaner-thresher was purchased; that it had a capacity of cutting 15 acres per day; that the gleaner had theretofore been sold to L. D. Haws at Holbrook, Idaho, and that he operated it successfully for the season of 1927, but the plaintiff was compelled to repossess it because Haws failed to make the purchase payments as he had agreed to do; that such representations were relied on by the defendants in the purchase of the machinery, but that they were false and were made to deceive the defendants and induce them to purchase the machinery; that the gleaner was so constructed as not to be suitable for cutting or harvesting heavy irrigated grain or any other kind of grain; that it would not cut grain in which sweet clover, or sunflowers, or cockleburrs or other weeds were growing, and could not be operated to cut 15 acres a day; that the plaintiff did not repossess the gleaner from Haws for non-

payment of the purchase price, as represented, but, on the contrary, Haws operated the gleaner for approximately only a week, and found it would not operate satisfactorily, and for such reason returned the gleaner and machinery to the plaintiff at Malad, Idaho, and refused to pay for it, which facts were fraudulently concealed from the defendants in order to induce them to enter into the contract to purchase the machinery.

It was further alleged on information and belief that during the year 1927 the plaintiff sold other gleaners to farmers in various parts of Utah and Idaho prior to the purchase of the defendants; that such prior purchasers notified the plaintiff that the gleaners were not as represented, and were valueless for the purpose for which they were sold, which facts also were withheld by the plaintiff from the defendants; that the gleaner, when it was purchased by the defendants, was of no value whatever, and, because of the false and fraudulent representations and concealments, the defendants were damaged in the sum of $1,000, which amount they prayed be offset against whatever amount might be found due and unpaid on the contract or on the mortgage.

To the answer the plaintiff filed a reply in which it specifically denied the affirmative defenses alleged in the answer, and averred that by the contract it was stipulated that no verbal or any agreement, warranty, or guaranty or representation whatsoever was binding on either party, except as contained in the contract itself; that by the terms of the agreement it was stipulated that the defendants were required to give five days' notice after delivery if the machinery failed to operate or was defective, and give the plaintiff a reasonable time to remedy whatever difficulty there might be, but that the defendants failed to give any notice whatsoever within such five days or at any other time; that, the machinery being secondhand, it by the terms of the contract was stipulated that the plaintiff was not to be held liable for any damages sustained in the use or opera-

tion of the machinery, nor for any implied warranties, nor for any delay or nonperformance of the machinery from any cause whatsoever; that the terms of the contract provided that the machinery or parts claimed to be defective were required to be returned to the plaintiff, or the plaintiff given notice thereof, but no such notice was given nor was there any return or offer of return made; that the defendants used and operated the machinery for more than two years without making any claim or giving any notice of defect; and that the defendants were thus guilty of laches, and were estopped and barred from now making any such claim.

Upon such issues the case came on for trial before the court and a jury. At the conclusion of the evidence, the court, holding that the case was one in equity to be tried by the court and not by a jury, dismissed the jury, and made findings and conclusions upon which judgment was rendered ordering a foreclosure of the mortgage and sale of the mortgaged property as by law in such case made and provided.

Among other things, the court found that on June 8, 1928, the defendants entered into a contract in writing with the plaintiff whereby they, for the sum of $1,625, purchased the gleaner-thresher and Fordson tractor, as in the complaint alleged and as shown by the written contract attached to the complaint; that on July 1, 1929, to secure the payment of the indebtedness as evidenced by the contract, the defendants Loren Kay and Zina Kay, for a good and valuable consideration, mortgaged the property described in the mortgage and in the complaint; and that the payments made on the indebtedness and the amount due and unpaid were as alleged in the complaint.

The court further found:

"That when the plaintiff sold and delivered to the defendants, the goods, wares and merchandise set out in the contract sued upon, there were no fraudulent of false representations made to the defendants by the plaintiff; that the gleaner which the plaintiff sold to the de-

fendants was a second-hand gleaner, and had been returned to the company by one L. D. Haws of Holbrook, Idaho, for the reason that said gleaner was not adapted for use on Haws' particular farm; that the plaintiff told the defendants that the gleaner was secondhand, and that it had been returned by Mr. Haws, and that the plaintiff told the defendants that it would operate as well as any other machine of the same type.

"That said gleaner-combine was used by said defendants for a period of two seasons, and the first season made a profit on the gleaner of $400.00; that said gleaner cut the wheat which the defendants wanted to cut, and for which purpose the gleaner was purchased, in a satisfactory manner; that the gleaner operated in the manner and way in which the plaintiff represented to the defendants that it would work.

"That the plaintiff did not represent to the defendants that said gleaner would cut sweet clover, weeds, cockleburrs or sunflowers; that the plaintiff did not represent that it would thresh alfalfa and clover seed.

"That all of the facts which the plaintiff knew relative to the defendants' purchasing said gleaner were equally within the knowledge of both the plaintiff and the defendants, and the plaintiff in no way deceived or defrauded the defendants by any false or fraudulent representations.

"That the defendants suffered no damage whatsoever either to the loss of crops or as the result of the alleged misrepresentations.

"That by the defendants' failure to comply with the terms of the contract and the failure of the defendants to give notice or make complaint at the proper time, they are guilty of laches and are barred from making any claim for any fraudulent representations; that the defendants have failed to return the gleaner-combine to the plaintiff, and still keep said gleaner."

As conclusions of law the court among other things stated:

"That the plaintiff in no way falsely or fraudulently misrepresented the character or quality of the gleaner-combine which the defendants purchased; that there was no fraud committed by the plaintiff in selling said goods, wares and merchandise to the defendants, and that the plaintiff is entitled to the further judgment against the defendants and each of them dismissing their recoupment or counterclaim, with prejudice."

The court further found and stated there was due the plaintiff the sum of $963.93, together with interest in the

sum of $162.56, $100 attorneys' fees and costs, and that the plaintiff was entitled to a foreclosure of the mortgage as in such cases made and provided and for a deficiency judgment against all of the defendants. Judgment was entered accordingly.

Three principal questions are presented by the appeal: (1) Alleged error of the court in refusing to submit the case to the jury; (2) failure of the court to specifically find upon the issues as to the alleged misrepresentations and fraud, and that the findings pertaining to such issues are not supported by the evidence; and (3) error of the court in rendering a deficiency judgment against the defendant Zina Kay.

In support of the first, it is urged that the allegations of the complaint as to the purchase and delivery of the machinery, the execution of the contract and of the mortgage and as to the payments made thereon having all been admitted, or at least not denied by the answer, the only triable issues were those relating to the misrepresentations and fraud alleged in the answer and denied by the reply, which issues, as it is claimed, were of a legal character and not equitable, and hence were triable to a jury. To that, cases are cited, *Park* v. *Wilkinson,* 21 Utah 279, 60 P. 945, 946, to the effect that, where there are both equitable and legal issues in a case, the court should first determine the equitable issues and then submit the other issues of fact to the jury; *Benson-Stabeck Co.* v. *Farmers' Elevator Co.,* 66 Mont. 395, 214 P. 600, where, under the Montana Constitution and Code, actions for the recovery of money claimed to be due on contract are triable by jury, the defendants were entitled to a submission of disputed issues of fact to the jury, though the plaintiff also sought to foreclose a mortgage given by one of the defendants; *Lehman* v. *Coulter,* 40 N. D. 177, 168 N. W. 724; *State Bank of Cuthbert* v. *Carlton,* 44 S. D. 199, 183 N. W. 119, and other cases; and 35 C. J. § 32, p. 162.

In the case of *Park* v. *Wilkinson* the court regarded the case brought by the plaintiff as an action at law. Said the court:

"The action was in the nature of one in ejectment. Such are law cases, in which a jury may properly be demanded, unless equitable questions are involved. In such cases the equitable issue should first be passed upon by the court, and whenever an issue of fact, as distinguished from an equitable issue, is to be determined, that question should be left to the jury, under proper instructions from the court."

The court thus regarded the case as characterized by the initial pleading, by the complaint, as an action at law, and not as a suit in equity, against which the defendant by "cross-complaint" pleaded and prayed for equitable relief. That also was the situation in the cited case of *Steele* v. *Boley*, 7 Utah 64, 24 P. 755, and upon which the case of *Park* v. *Wilkinson* was to some extent, if not largely, ruled. The other cited cases also are distinguishable from the present case. By the section referred to in Corpus Juris, it, among other things, is there stated that, where an issue at law is conclusive of the rights of the parties, or where legal relief is alone warranted by the facts pleaded, a jury trial cannot be denied, and, conversely, if any essential part of the case is exclusively of equitable cognizance, the right of trial by jury does not obtain, though certain elements of an action at law may be incidentally involved.

The case in hand more properly falls within the later case of *Escamilla* v. *Pingree*, 44 Utah 421, 141 P. 103, L. R. A. 1915B, 475, where it was held, as disclosed by the syllabi, that an action on a note and to foreclose a mortgage given as security was purely equitable, and its character as such was not affected by the fact that a jury was called to pass on the facts nor were the province and duties of the trial court or appellate court affected thereby. Such case is, as we think, in line with the doctrine stated in 1 Pomeroy's Equity Jurisprudence (4th Ed.) § 181, et seq., that:

"The concurrent jurisdiction of equity to grant remedies which are legal in cases which might come within the cognizance of the law courts is materially affected by the operation of two important principles, which are now merely stated, and which will be more fully discussed in a subsequent section. The first of these principles is, that when a court of equity has jurisdiction over a cause for any purpose, it may retain the cause for all purposes, and proceed to a final determination of all the matters at issue. For this reason, if the controversy contains any equitable feature or requires any purely equitable relief which would belong to the exclusive jurisdiction, or involves any matter pertaining to the concurrent jurisdiction, by means of which a court of equity would acquire, as it were, a partial cognizance of it, the court may go on to a complete adjudication, and may thus establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority."

In section 183, the author, in considering the effect of the reformed procedure whereby the distinctions between legal and equitable actions are abolished and the court clothed with both jurisdictions of law and equity in combination, says that:

"It is plain from the foregoing rules of the reformed procedure that a court clothed with full equity powers may, by means of a suit equitable in its form, and requiring the determination of equitable primary and remedial rights, also adjudicate upon rights and award remedies strictly legal, which might be adjudicated upon and awarded in an action at law; and this is the essential feature of the concurrent jurisdiction."

In 24 Cyc. 127, it is stated that, while actual fraud is a question of fact, it does not follow that it must always be tried by jury, and that, "where fraud is pleaded ▉ as a defense in an action at law the issue is triable by the jury, and in a suit in equity by the court."

But further as to this. The contention of the defendants that, because of the admissions of the answer, no issuable fact of equitable cognizance was presented by the pleadings, is hardly tenable. We think the proposition is stated too broadly. Under statutes such as we have and as ▉ generally obtain in other jurisdictions, a necessary

part or basis of a mortgage is a debt or other obligation to secure the payment or performance of which the mortgage is given. When the debt or obligation is denied, proof thereof is essential to the right of foreclosure, and, if the debt or other obligation falls, the mortgage falls. Here the mortgage was given to secure the payment of what then remained due and unpaid on the contract of purchase of the machinery, amounting to $1,183. By the complaint it is alleged that thereafter there was paid on the indebtedness $243, leaving a balance due and unpaid in the sum of $963. That balance so remaining due and unpaid was denied. It also is denied that the mortgage was given for a good consideration, and it was alleged that it was given without consideration. All that related to the right of foreclosure itself. Though the pleaded affirmative defenses in character were legal, yet they no more prevented or relieved the court from determining the whole issue than if the defendant had pleaded payment or non est factum. Because as to the pleaded defenses the burden of proof was cast on the defendants, again no more relieved the court from the duty and responsibility of determining the whole issue than if a plea of payment or of confession and avoidance had been interposed. We therefore are of the opinion that no error was committed in the court's ruling dismissing the jury and in determining the whole issue presented by the pleadings.

Now, as to the second proposition, that the court failed to find on all the material issues and that the findings are not supported by the evidence. It, of course, is elementary that the court in making findings is required to find on all the material issues. The contention in such respect is that the findings as to the alleged misrepresentations and fraud are not sufficiently specific; that they are too general, in particulars mere conclusions. As bearing on that, we have referred to the pleadings and to the findings more in detail than perhaps is necessary. Findings are required only as to ultimate facts, not necessarily as to all specifically alleged facts involved in the findings

of ultimate facts. It is not infrequent, as here was the case, where numerous specific facts are alleged quite in detail leading up to or going to make up ultimate facts and which are involved and disposed of by findings of ultimate facts. Comparing the findings with the alleged pleaded affirmative defenses, we think all of the ultimate facts with respect thereto were sufficiently negatived and disposed of. The court was not required to negative such allegations in language of the answer. It is enough if what was found substantially negatived what in such respect was alleged. If what was found be true, it follows as night the day that the allegations in the answer are untrue. They both cannot stand.

It is claimed that some of the findings were mere conclusions. The statute (Comp. Laws 1917, § 6829) requires the facts found and the conclusions of law to be separately stated, which is merely directory, 2 Hayne, New Trial and Appeal (Rev. Ed.), infra. It sometimes is rather difficult to determine whether a finding is a mere conclusion or a statement of an ultimate fact. Findings must be considered together and in view of the pleadings. "It often happens," as is stated in 2 Hayne, New Trial and Appel (Rev. Ed.) p. 1350, "that findings of fact are stated as conclusions of law. But this does not prevent the finding from being accepted as a good finding," citing cases. The author further says that a finding, although stated among the conclusions of law, may nevertheless be regarded as a finding of an ultimate fact. As is seen, the court here specifically found against the defendants as to particular alleged facts. It found that the plaintiff told the defendants, and they knew, the gleaner was a secondhand gleaner; that it had theretofore been sold by the company to Haws, and was returned by him for the reason that the gleaner was not adaptable for use on his farm; that the gleaner cut the wheat that the defendants wanted to cut, and for which purpose the gleaner was purchased, in a satisfactory manner, and that the gleaner operated in the manner and way

in which the plaintiff represented to the defendants that it would work; that the plaintiff did not represent to the defendants that the gleaner would cut sweet clover, weeds, cockleburrs, or sunflowers, and did not represent that it would thresh alfalfa and clover seed; and that in the sale and delivery of the machinery "there were no fraudulent or false representations made to the defendants by the plaintiff"; and "that all of the facts which the plaintiff knew relative to the defendants' purchasing said gleaner were equally within the knowledge of both the plaintiff and the defendants, and the plaintiff in no way deceived or defrauded the defendants by any false or fraudulent representations." In the conclusions of law it also was stated, which was more in the nature of a finding, that "the plaintiff in no way falsely or fraudulently misrepresented the character or quality of the gleaner-combine which the defendants purchased; that there was no fraud committed by the plaintiff in selling the machinery."

We think such findings were something more than mere conclusions. The effect of them is to negative every allegation of misrepresentation and fraud alleged in the answer.

Now as to the proposition that the findings as to the issues of fraud and misrepresentations are not supported by the evidence. Let it be conceded that the evidence in such particular is in conflict, and that the duty, in an equity case as this is, is cast on us to determine on the record whether the findings are contrary to the greater weight of the evidence or whether they were such as on the record ought to have been made. By the testimony on behalf of the defendants it chiefly is contended that the gleaner-thresher could not be properly operated, that it would not cut grain with weeds or sweet clover, that the machinery would clog up, the weeds wrap around the cylinder and throw off the belt and break the slats, and that the machinery would not cut grain on irrigated ground "without a lot of trouble." While we recognize the rule as stated by the Idaho court in the case of *Advance-Rumely*

*Thresher Co.* v. *Jacobs*, 51 Idaho 160, 4 P. (2d) 657, to be the majority rule, that it is competent to show by evidence dehors the contract that the execution of it was induced by fraud and misrepresentations, notwithstanding language or stipulations of the contract that no promises, agreements, or representations were made not contained in the contract itself, and that no promise, agreement, or representation not contained in the contract is binding between the parties, still we think the application of the rule, in the sale of secondhand machinery or implements, does not permit the parties by parol to vary the terms of a written contract as to warranties, either express or implied, and by such means ingraft a warranty, either express or implied, where, by direct and positive terms of the contract, all kinds of warranties, both express and implied, were excluded and contracted against, when, and as here shown, the parties stood upon an equality and with equal means of knowledge dealt with each other at arm's length and no fraud or deceit practiced or mutual mistake shown as to the contents of the contract. Here it was expressly stipulated and agreed that the machinery, being secondhand machinery, was sold at a greatly reduced price without warranty or condition, and that the company was not liable for any nonperformance of the machinery from any cause whatsoever.

But aside from this, and keeping in mind that this action was brought to foreclose a mortgage given to secure the purchase price of the machinery as evidence by the contract and the mortgage and for a deficinecy judgment, we think the defendants have not shown any equity or defense. It is indisputably shown that the defendants Loren Kay and Cooke, who executed the contract, fully inspected and examined the machinery at Malad before the contract was entered into, and then knew the machinery was secondhand and that it had theretofore been sold to Haws and that it was returned by him to the plaintiff. The defendant Loren Kay, the principal defendant, and for whose benefit the gleaner-thresher and tractor were purchased, so

testified. He further testified that the first season, the season of 1928, he with the machinery cut 300 acres of wheat at a profit of $400. That was before he executed the mortgage on July 1, 1929. He testified that the first year he had trouble with the gleaner-thresher—just as much and the same kind of trouble he claimed he had the second season after the mortgage was given—and testified that there was not anything he knew about the equipment when this action was commenced that he did not know when the mortgage was given. In other words, when he signed the mortgage, as he testified, he then knew fully as well as when the action was commenced that the claimed representations of the plaintiff and as alleged to have been made were false and that the machinery was not what, as he claimed, it was represented to be, except as he testified he did not know until after the action was commenced and after he had talked with witnesses that the plaintiff made the representations with knowledge of their falsity. In that connection it also is urged that the court made no finding, not as to when the defendants discovered the alleged falsity of the representations, but as to when they discovered the plaintiff had knowledge of their falsity; that is, the claim is made that while the defendants had knowledge of the falsity of the alleged representations when the mortgage was given, yet did not know until after the action was commenced and the defendants had talked with witnesses that the plaintiff had knowledge of the falsity of the representations when made. Much is made of such claim in an attempt to ward off the charge that the defendants, with knowledge of the falsity of the alleged representations, executed the mortgage and kept and operated the machinery for several years without notice or complaint to the plaintiff of any defect in the machinery. We think the claim groundless. In the first place, the court in effect found that no misrepresentations or fraudulent representations were made by the plaintiff. In the next place, the representations cliamed to have been made implied knowledge of the declarant, and the circum-

stances under which it was claimed and alleged the representations were made imposed a duty on the declarant or the plaintiff to know the truth. The law is well settled that an unqualified affirmation of a fact not known to be true may constitute fraud and subject the declarant to liability for its falsity. As put by some of the cases, that, where one professes to possess knowledge of a fact and for the fraudulent purpose of inducing another to act, makes a statement of fact which is untrue, and thus misleads the person whom he has induced to act, he is guilty of fraud, although he did not know the statement to be false. By other cases it is said that one who is under duty to give information to another and who states a fact to be true when he has no knowledge on the subject, and thus misleads the other to his injury, is as much liable in law for fraud as if he had willfully misstated a fact as true when he knew it was false. 26 C. J. 1108-1110.

Here, notwithstanding the defendants when the mortgage was given knew that the representations claimed to be made by the plaintiff with respect to the gleaner-thresher were false, they thereafter continued to use the equipment at least the second season and cut about 100 acres of wheat—whether that was all the wheat they that season had to cut is not made to appear—and thereafter in September, 1929, paid $200 on the principal and $43.85 on the indebtedness to secure which the mortgage was given. When before the mortgage was given demands were made for payments on the contract, and after the machinery had been used one season in cutting 300 acres of wheat at a profit of $400, no claim was then made, nor when the mortgage was given, that the machinery or any part thereof was not what it was represented to be or that it was defective or would not properly operate. Nor was there any such claim made after the mortgage was given and the machinery operated for a second season, and when thereafter the payment of $243.85 was made on the mortgage. Nor was there any such claim made when demands for payments were

made thereafter. All such matters have a bearing, not only as to the pleaded laches and estoppel, but they also have considerable probative effect on the weight to be given the testimony of Loren Kay, the principal defendant, and the only witness who testified as to the alleged representations having been made, and the making of them denied by the testimony of the salesman of the plaintiff and who negotiated the sale and who, as Kay testified, made the representations.

At no time did the defendants repudiate the contract or offer to return either the tractor with which they were satisfied or the gleaner-thresher with which they claimed they were dissatisfied, and as alleged by them was of no value whatever when the contract was entered into, yet retained and now claim the right to retain both, and offset their alleged claim for damages of $1,000—the full purchase price of the gleaner-thresher after it was used and possessed by them for over two years without notice to the plaintiff of the alleged defects—against whatever amount might be found due on the unpaid purchase price of both the tractor and the gleaner-thresher, which was alleged and found to be $963.93 when the action was commenced.

We think the trial court was justified in finding that the alleged misrepresentations were not made, and that no fraud was practiced on the defendants as alleged by them. We approve such findings and the result reached by the trial court.

Now, as to the deficiency judgment rendered against Zina Kay: The contract on behalf of the defendants was signed alone by Loren Kay and Cooke. The mortgage, as mortgagors, was signed and executed alone by Loren Kay and Zina Kay. It was given to secure the payment of the amount then remaining due and unpaid on the contract. Neither by the mortgage or otherwise did Zina Kay agree to pay the indebtedness to secure which the mortgage was given. Hence it follows that no deficiency judgment could properly be rendered against her. If the debt

was not paid, her obligation was only to yield up the mortgaged property in satisfaction of or to be applied on the debt. The only legal judgment which could be rendered against her was the foreclosure of all her right, title, and interest in and to the mortgaged property. The judgment as to her is therefore modified in such particular and the court directed to enter a judgment against her as indicated.

The judgment as rendered against Loren Kay and Cooke is affirmed. Costs on the appeal are awarded to the respondent as against the appellants Loren Kay and Cooke but not as against Zina Kay; she is given her taxable costs against the respondent.

FOLLAND and EPHRAIM HANSON, JJ., concur.

MOFFAT, J., did not participate herein.

ELIAS HANSEN, Justice (dissenting).

In my opinion, the judgment in this case should be reversed and a new trial granted. In remanding the cause for a new trial, the parties should be permitted, if they are so advised, to amend their pleadings. I concur in the views expressed in the prevailing opinion that this cause is one of equitable cognizance. A proceeding to foreclose a chattel mortgage is a suit in equity. Whether a decree of foreclosure of a chattel mortgage should or should not be entered depends on whether or not anything is owing upon the obligation secured by the mortgage, and in the event the mortgage is to be foreclosed a determination of the amount owing and secured by the mortgage. A suit to foreclose a mortgage does not cease to be a suit in equity because the mortgagor claims a set-off or recoupment against the amount claimed to be owing. The cases cited in the prevailing opinion amply support such view. I also concur in the view expressed in the prevailing opinion that the deficiency judgment against Zina D. Kay should be reversed. The assignments of error are made jointly by the defendants.

As a general rule, where several appellants jointly assign error, they must be disregarded as to all, unless the assignments are good as to all joining therein. Such rule, however, has no application where the mandatory record of the court shows that the judgment is not supported by the pleadings. It is alleged in the complaint filed in this cause that Loren Kay and George S. Cooke signed the contract for the purchase of the combine gleaner. A copy of the contract of purchase is attached to and made a part of the complaint. It shows that Mrs. Kay did not sign the contract. She did sign the chattel mortgage and that only. She was therefore not liable for the purchase price of the machinery beyond what might be received for the sale of the mortgaged chattels. When the mandatory record shows that the judgment was rendered contrary to fundamental law, such judgment is void for all purposes. In the language of Mr. Justice Straup, writing the opinion for this court in the case of *Worley* v. *Peterson,* 12 P. (2d) 579, at page 587:

"And a judgment founded upon such a record is subject to direct and collateral attack, and will, sua sponte, be noticed by courts and acted upon by them without regard to the wishes or relation of the parties named upon the record."

The complaint upon which the judgment in this case was rendered showing, as it does, that the judgment against Mrs. Kay is wrong, this court should order it vacatd as to any deficiency without regard to the assignments of error. It is urged on behalf of appellants that the defendant Cooke was entitled to a jury trial, in any event, because he did not sign the chattel mortgage. As already indicated, all of the assignments are made jointly, and this appeal was taken jointly. This court is committed to the doctrine stated in *McGuire* v. *State Bank of Tremonton,* 49 Utah 381, 164 P. 494, 495.

"It is well settled that, where several appellants jointly assign errors, unless the assignments are good as to all who join therein, they must be disregarded as to all."

If, therefore, Mr. and Mrs. Kay were not entitled to a jury trial, it follows that the defendant Cooke, having joined with them in the assignments, may not succeed unless Mr. and Mrs. Kay are also entitled to succeed on the assignments.

This proceeding being a suit in equity, the parties are entitled to have this court review both questions of law and of fact. In their assignments of error, appellants have attacked those findings which are to the effect that plaintiff in no way deceived or defrauded the defendants in the transaction for the sale and purchase of the combine gleaner. In my opinion, the clear preponderance of the evidence requires a finding that the plaintiff perpetrated a fraud upon the defendants in the sale of the combine harvester.

There is no conflict in the evidence as to these facts: The contract for the sale and purchase of the combine gleaner was entered into on June 8, 1928. The contract price was $1,625. The gleaner was valued at $1,000, and the Fordson tractor, which was to be used to furnish the power to operate the gleaner, was valued at $625. The gleaner had been used before the contract was entered into, but apparently the tractor had not. The sum of $100 was paid on the date the contract was entered into. The sum of $300 was to be paid on the day of delivery, $425 on December 1, 1928, and the remainder on December 1, 1929. At the time the contract was entered into, the gleaner was not set up. It was at Malad, Idaho. The contract was entered into at Tremonton, Utah. When the contract was entered into, no grain was ripe in the vicinity of Malad or Tremonton, so there was no way at that time of trying out the gleaner. In the summer of 1927 the gleaner had been sold to a Mr. Haws, who resided at Holbrook, Idaho. Mr. Haws attempted to operate the gleaner, but after a trial of a few days he notified the plaintiff company that it would not operate successfully, and requested the company to come and get it. The agents of the plaintiff company attempted to convince Mr. Haws that he should give the gleaner a further trial, but he refused to do so. James Walton represented the

plaintiff company in the sale of the gleaner to the defendants. He was familiar with the land and the kind of grain that was grown by the defendant Kay and others in the vicinity where the gleaner was to be used. Mr. Kay's land and the other lands in that vicinity were level. During the negotiations which preceded the execution of the contract, Mr. Walton stated to the defendant Kay that the combine gleaner was what he needed, and that it would successfully harvest his grain and the other grain crops in that vicinity; that the combine gleaner would work as successfully as other combine harvesters. There is a slight discrepancy between the testimony of the defendant Kay and of Mr. Walton as to what was said in the negotiations which led up to the execution of the contract. Defendant Kay testified that Mr. Walton stated that the company had repossessed the harvester from Mr. Haws the year before, and that Mr. Walton did not tell him of any one other than Mr. Haws who had used that particular type of combine harvester. Mr. Walton testified that he informed Mr. Kay of a number of persons who had successfully used gleaners of the same type as the one in question; that he informed Mr. Kay that the gleaner which he proposed to sell had been repossessed from Mr. Haws the year before; that the gleaner would not operate successfully on hilly ground, and that was the reason Mr. Haws returned the gleaner.

The defendants called as witnesses L. D. Haws and Clarence Haws who in 1927 agreed to purchase the gleaner in question. Their testimony is to the effect that the land upon which they attempted to use the gleaner was level; that the grain was free from weeds, and went about 15 bushels to the acre; that the gleaner could not be made to cut or thresh their grain successfully; that it would not separate the grain from the straw; that it clogged up and gave them so much trouble that after a trial of five or six days they were compelled to abandon its use. The defendant Kay testified that the gleaner could not be made to operate successfully; that the reel chain was always breaking; that,

if there were weeds in the grain, the reel chain would pull off; the weeds would wrap around the cylinder, the sprocket chain, the slats, the belting, and tail worm; that the belting would fly off; that it was frequently necessary to cut out the weeds and wild oats which would clog various parts of the gleaner; that the clutch would wear so that it was necessary to file notches therein; that in a short time it would again become necessary to file notches in the clutch; that during the first year he harvested 300 acres of grain, during the second year about 100 acres; that, after the harvester had been used two years, it was worn out and worthless. The testimony of the defendant Cooke is to the same effect as is the testimony of the defendant Kay. A Mr. Allen testified that soon after Mr. Haws purchased the gleaner in question he used it to cut 11 acres of his (Mr. Allen's) grain; that it took him five days to cut 11 acres; that the gleaner failed to separate the grain from the straw, and as a result much of his grain was wasted; that the cutter bar of the gleaner was eight feet wide, but in order to operate the gleaner it was necessary to cut a swath of from one to three feet in width. Mr. Allen corroborated the testimony of the defendants Kay and Cooke as to the difficulties encountered in operating the gleaner. Defendants called a number of farmers who had attempted to operate a gleaner of the same type as that purchased by defendants Kay and Cooke. Their testimony tends to show that other gleaners of the same type as the one in question could not be made to operate successfully on either hilly or level ground; that, after such gleaners were operated for a short period of time, they shook to pieces. The testimony of these farmers was admitted over plaintiff's objection. It was offered and admitted on the theory that it tended to show that plaintiff, at the time it sold the gleaner involved in this controversy, knew that it would not operate successfully. No complaint is made on this appeal because of the admission of such testimony. Three of the plaintiff's employees testified concerning the character of the work that

the type of gleaner here involved was capable of doing. Their testimony is to the effect that, while such gleaners could not be successfully operated in hilly ground, they could be operated successfully on level ground. The plaintiff did not offer any evidence touching the manner in which the gleaner in question operated except on the first day that it was used by the defendant Kay. It was also made to appear that after one or two years the gleaners, such as the one in controversy, were not manufactured.

Plaintiff in its brief earnestly contends that the evidence conclusively shows that the gleaner was in fact as represented because it was used to harvest 300 acres of grain during the first year and 100 acres during the second year after it was purchased by the defendants. As already stated, the contract price of the harvester and the Fordson was $1,625, of which $1,000 was for the gleaner and $625 for the Fordson. It appears that the price paid for the harvesting of grain with a gleaner was from $2.25 to $2.50 per acre. If defendants' evidence is to be believed, and there is no evidence to the contrary, the gleaner was valueless after it had been used to cut 400 acres. Thus the grain cut at the maximum of $2.50 per acre would barely pay for the gleaner, allowing nothing for the depreciation of the value of the Fordson and nothing for the time and expense incident to the harvesting of the 400 acres of grain. Machinery which cannot be used to earn sufficient to pay its purchase price may not well be said to operate successfully. It is further urged on behalf of respondent that there was no occasion for appellants to rely on the representations made by respondent's agents; that Mr. Kay could have ascertained for himself just what the combine gleaner was capable of doing. The policy of the law is on the one hand to suppress fraud, and on the other to discourage inattention to one's own interest. Respondent contends that appellants' own negligence or inattention to their own interests should, in any event, preclude them from interposing a defense of fraud in this proceeding. The courts are not entirely in accord

as to the circumstances under which the negligence of a party to a contract defeats his right to recover for fraud. It may be said generally that: "Where the means of knowledge are at hand and are equally available to both parties, and the subject matter is alike open to their inspection, if one of them does not avail himself of those means and opportunities, he will not be heard to say that he was deceived by the other's misrepresentations. But this doctrine does not authorize deception in what is said or unsaid, and hence the effect of negligence on the part of the party deceived may be tolled by the active fraud of the other party." 12 R. C. L., § 123, p. 372. Applying these principles to the evidence in the instant case, it cannot be said that the defendant Kay was guilty of any negligence at or before the time the contract was entered into which would defeat his rights to recover for a fraud perpetrated upon him.

The gleaner was "knocked down" at the time the contract was entered into. Grain was not then ripe, and so the gleaner could not have been tried out if it had been set up. It is suggested that Mr. Kay should have gone and made inquiry of L. D. and Clarence Haws as to why they could not operate the gleaner successfully. In the light of the fact that the plaintiff's sales agent informed Mr. Kay that Mr. Haws turned the gleaner back because it would not operate successfully on hilly ground, it cannot be said that Mr. Kay was negligent in failing to consult Mr. Haws. The defendant Kay testified that he relied upon the representations made by Mr. Walton. It is quite obvious that the defendants Kay and Cooke would not have purchased a combine harvester at a price of $1,625 unless they believed it could successfully harvest grain. In my opinion, the clear preponderance of the evidence establishes all of the essential elements of actionable fraud on the part of the plaintiff in securing the execution of the contract involved in this controversy.

I dissent from the view expressed in the prevailing opinion that plaintiff's reply alleged sufficient facts to raise an

issue as to a waiver of the fraud alleged in defendants' answer. The reply contains a denial that plaintiff perpetrated any fraud upon the defendants. By an amendment to the reply, plaintiff alleged various facts which may well preclude defendants from recovering any damage on account of any breach of contract. Thus it is alleged in the reply that the contract expressly mentions that the gleaner is secondhand, and as such is not warranted; that by the terms of the contract defendants had no right to recover on any warranty contained in the contract, unless written notice was given plaintiff within five days after receipt of. the machinery of any failure of plaintiff to fulfill any warranty in the contract and that no such notice was given. All of the allegations in the reply are directed against defendants' right to recover under the terms of the contract. As I understand defendants' answer, it proceeds upon the theory that defendants have the right to recover for a tort. They make no claim that they are entitled to recover on the contract. It is no defense to an action for a tort to say that recovery may not be had on a contract. The stipulations of the contract pleaded in plaintiff's reply cannot be said to relieve it from liability for fraud. If the stipulations in the contract were intended to relieve plaintiff from its fraud, they are void because against public policy. 13 C. J. § 350, p. 420. Nor can it in my opinion be said that the defendants have pleaded a waiver of fraud.

There is a vast distinction between a suit to rescind a contract and an action to recover damages sustained by a party to a contract because of the fraud of the other party to such contract. The defendants in this case concede, as well they may, that they are precluded from rescinding the contract by reason of the fact that they have made payments on the contract and have executed a mortgage for the unpaid part of the contract price. It by no means follows, however, that defendants are also precluded from their right to recover damages because of fraud and deceit practiced on them as an inducement to them to enter into the

contract. *Cook* v. *Covey-Ballard Motor Co.*, 69 Utah 161, 253 P. 196.

"One who has been injured by fraud may elect to accept the situation created by the fraud and seek to recover his damages or he may elect to repudiate the transaction and seek to be placed in statu quo. * * * One who by fraud has been induced to enter into a contract may affirm the contract and maintain an action to recover the damages which he has sustained, or may set up such damages by way of defense or recoupment or counterclaim, or he may rescind the contract and avail himself of the remedies based upon a rescission, or he may sue in equity in a proper case to cancel or rescind the contract, or to secure a reformation of the instrument." 27 C. J. 18.

The right of a defrauded party to recover damages because of fraud perpetrated upon him may also depend upon whether the contract sued upon is executed or executory. Again quoting from 27 C. J. pp. 24-26, we find the law thus stated:

"Acts upon the part of the defrauded party in performance or affirmance of the transaction or in the exaction of performance from the other party after a discovery of the fraud and while the contract or transaction remains entirely executory upon his part will ordinarily preclude him from thereafter asserting a cause of action for deceit, although there is some authority to the contrary. Under such circumstances a recovery would be largely if not entirely for self-inflicted injuries and the maxim, Volenti non fit injuria, applies. * * * Where plaintiff has fully executed his part of the contract, acts thereafter done by him in affirmance of the contract and with knowledge of the fraud do not ordinarily amount to a waiver. But even in case of an executed contract the fraud practiced in procuring it may be waived by the defrauded party where his acts and conduct clearly indicate an intention to ratify the contract and to abandon his right of action in deceit. * * * The rule permitting acts in affirmance of an executed contract to be performed after discovery of fraud without waiving an action for deceit applies also, generally speaking, to a contract which is partly executed at the time of discovery of the fraud, particularly where further damage would be occasioned to the defrauded party by a recission, or the past performance is such that the party cannot safely discontinue or recede, or further performance is necessary to determine positively whether fraud has been practiced, although some courts have applied the rules applicable to wholly executory contracts. * * * Laches or delay which

might preclude the defrauded party from rescinding the contract induced by the fraud does not affect his right of action for damages, but he may bring his action of deceit at any time within the period fixed by the statute of limitations."

Numerous cases are cited in footnotes which support the rules announced in the text. The contract here involved was not executory, and therefore the rule applicable in such case does not apply. In the case of *Wilson* v. *Meyer,* 23 Utah 529, 65 P. 488, 491, this court said:

"A waiver is 'the relinquishment or refusal to accept of a right.' Bouv. Law. Dict. It is effective only when it is made intentionally and with knowledge of the circumstances."

In 40 Cyc. 261, it is said:

"The question of waiver is mainly a question of intention, which lies at the foundation of the doctrine. Waiver must be manifested in some unequivocal manner, and to operate as such it must in all cases be intentional. There can be no waiver unless so intended by one party and so understood by the other, or one party has so acted as to mislead the other and is estopped thereby. Since intent is an operation of the mind it should be proven and found as a fact, and is rarely to be inferred as a matter of law."

To the same effect is the statement of the law in 27 C. J. 22. The mere giving of renewal notes after the discovery of the fraud in a contract does not, as a matter of law, operate as either a waiver or as an estoppel. *Garrett* v. *Neitzel,* 48 Idaho 727, 285 P. 472; *Bean* v. *Bickley,* 187 Iowa 689, 174 N. W. 675; *Sell* v. *Mississippi River Logging Co.,* 88 Wis. 581, 60 N. W. 1065; *Graham-Jones Motor Co.* v. *Nutter,* 77 Colo. 74, 234 P. 1063. The intent to waive a right being an essential element of a waiver, it was necessary for the plaintiff to plead that fact before such defense was available to it. Neither plaintiff nor defendant pleaded such fact, and therefore in my opinion there is no issue in this case raising the question of a waiver. Nor are there any facts found by the trial court which supports a conclusion of law that defendants waived the fraud. The only findings touching that

question are findings numbered 5 and 13. In finding No. 5 the court found the number and amounts of the payments that had been made on the contract. No complaint is made of that finding. Finding No. 13 reads as follows:

"That by the defendants' failure to comply with the terms of the contract and the failure of the defendants to give notice or make complaint at the proper time, they are guilty of laches and are barred from making any claim for any fraudulent representations; that the defendants have failed to return the gleaner-combine to the plaintiff, and still keep said gleaner."

Appellants assign as error the making of the finding just quoted because, as they claim, the finding is a conclusion of law and is not supported by, but is contrary to, the evidence. The claim that the finding is a conclusion of law would seem to be well taken as to a part thereof. There are no sufficient facts there found or elsewhere in the findings which justify the conclusion that defendants have waived their right to a recoupment because of fraud. There being no issue and no sufficient finding as to the question of a waiver of fraud, this court should not, in my opinion, pass upon the question of whether the evidence does or does not show a waiver of fraud until such time as proper pleadings have been framed and the court below has been given an opportunity to make findings upon such issue.

In my opinion, the judgment should be reversed and a new trial granted. The appellants should be awarded their costs on appeal.

BATES, District Judge.

I concur with the views expressed by Mr. Justice ELIAS HANSEN in his dissenting opinion.